**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X Case No.

WARREN MITCHELL,

Plaintiff,

- against -

RIVERBAY CORPORATION & DOUGLAS ELLIMAN PROPERTY MANAGEMENT,

Defendant(s).

-----------------------------------------------------------------X

**COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff WARREN MITCHELL (hereinafter "Plaintiff" or "Plaintiff MITCHELL") by his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendant RIVERBAY CORPORATION (hereinafter "Defendant RIVERBAY"), and Defendant DOUGLAS ELLIMAN PROPERTY MANAGEMENT (hereinafter "Defendant ELLIMAN"), (hereinafter collectively referred to as "Defendants"), upon personal knowledge, as well as upon information and belief, by alleging and averring as follows:

## NATURE OF THE CASE

1. Plaintiff MITCHELL brings this action alleging that Defendants have violated Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* ("NYSHRL"), and the New York City Administrative Code § 8-107(a), *et seq.* ("NYCHRL"); and seeks damages to redress the injuries he has suffered as a result of being subjected to discrimination on the basis of his race (White) and retaliation for complaining of race discrimination.

## JURISDICTION AND VENUE

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under 42 U.S.C. § 2000e, *et seq*.

3. This Court has supplemental jurisdiction over Plaintiff's claims brought under state law and city pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Southern District of New York and a substantial part of the events or omissions giving rise to the claim occurred therein.

## PROCEDURAL PREREQUISITES

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6. Plaintiff received Notices of Right to Sue ("Notices") from the EEOC, dated April 29, 2025, with respect to the charges of discrimination contained herein. Copies of the Notices are annexed hereto as Exhibit A.

7. This Action is being commenced within ninety (90) days of said Notices.

8. Concurrently with the commencement of this action, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, in accordance with the New York City Administrative Code § 8-502(c).

## THE PARTIES

9. At all times relevant hereto, Plaintiff MITCHELL was and is a resident of the State of New York and County of Westchester.

10. At all times relevant hereto, Plaintiff MITCHELL was employed by Defendant RIVERBAY as a Deputy General Manager.

11. At all times relevant hereto, Defendant RIVERBAY was and is a property management company, duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 2049 Bartow Ave, Bronx, NY 10475.

12. At all times relevant hereto, Defendant ELLIMAN was and is a foreign limited liability property management company duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 675 Third Avenue, New York, New NY 10017.

13. At all times relevant hereto, Defendant ELLIMAN was and is responsible for overseeing Defendant RIVERBAY as a third-party management company.

14. At all times relevant hereto, Defendant RIVERBAY and Defendant ELLIMAN were joint employers of Plaintiff MITCHELL.

15. Defendant RIVERBAY is subject to all statutes upon which Plaintiff MITCHELL is proceeding herein.

16. Defendant ELLIMAN is subject to all statutes upon which Plaintiff MITCHELL is proceeding herein.

17. At all times relevant hereto, Defendant RIVERBAY was Plaintiff's employer under Title VII, the NYSHRL, and NYCHRL.

18. At all times relevant hereto, Defendant ELLIMAN was Plaintiff's employer under Title VII, the NYSHRL, and NYCHRL.

## MATERIAL FACTS

19. On or around July 29, 1995, Plaintiff MITCHELL began working for Defendant RIVERBAY as a Community Center Porter, earning a salary of $30,000 per year.

20. Plaintiff MITCHELL's employment with Defendant RIVERBAY spanned nearly 30 years,

during which time he held various positions in a managerial role, primarily at Cooperative City[1] ("Co-op City").

21. Plaintiff MITCHELL received above-average evaluations throughout his career and was promoted six times with significant salary increases, reflecting his positive work performance and contributions to the company.

22. In or around 1998, Plaintiff MITCHELL received his first promotion to Community Center Foreman increasing his salary to $38,000. His later promotions included Commercial Property Manager (2001, $48,000 annual salary), Residential Property Manager (2004, $52,000 annual salary), Director of Commercial Leasing (2007, $65,000 annual salary), Director of Parking Facilities (2011, $80,000 annual salary), and Assistant General Manager (2015, $115,000 annual salary).

23. In or around January 2020, Plaintiff MITCHELL received his sixth promotion, earning the title of Deputy General Manager of Defendant RIVERBAY, with an annual salary of $170,000.

24. By the time of his termination in 2024, Plaintiff MITCHELL's salary had increased to $176,000.

25. Beginning in approximately 2019, while Plaintiff MITCHELL maintained the position of Deputy General Manager, Noel Ellison, General Manager, and Robert Klehammer, Executive General Manager of Defendant ELLIMAN, began preparing Plaintiff for the role of General Manager by increasing his responsibilities. This position was crucial to the leadership of the corporation, which employs approximately 940 individuals.

26. Plaintiff MITCHELL, along with Mr. Ellison, Mr. Klehammer, and Cary Smith, Assistant

[1] Cooperative City aka Co-Op City is a cooperative housing development located in the Northeast Bronx, New York. Co-Op City is made up of seven (7) townhouse clusters, thirty-five (35) high-rise buildings, and 15,372 residential units. Defendant RIVERBAY is the corporate entity of Co-Op City.

Executive General Manager of Defendant RIVERBAY and Senior Property Manager of Defendant ELLIMAN, formed the executive team responsible for managing the day-to-day operations and future planning for the corporation. This team reported to the 15-member resident BOD[2]. Plaintiff MITCHELL became the liaison between Human Resources and the Executive team, working closely with Inelle Cooper on many employee-related issues. Further, he was tasked with negotiating 7 union contracts.

27. Notably, Mr. Ellison and Mr. Klehammer recognized Plaintiff MITCHELL's devotion to Defendants, as evidenced by his climbing of the internal ladder, and encouraged Plaintiff to obtain his Certified Property Manager certification to better position himself for the General Manager role by showing Defendants the benefit of outside global knowledge.

28. In or around July 2022, Mr. Ellison announced his retirement set to take place between the end of the year and the early months of the following year. Following the announcement, Mr. Ellison and Mr. Klehammer named Plaintiff as Mr. Ellison's successor in a corporate succession plan shared with Defendant RIVERBAY's BOD and outwardly expressed their support for Plaintiff's promotion.

29. Further, Mr. Ellison actively introduced Plaintiff MITCHELL as his successor to local, regional, and federal-level politicians who worked closely with Defendants.

30. In or around September 2022, Claudia Sampson (upon information and belief, Black and Hispanic), a member of the BOD, overheard Mr. Ellison's remarks during a political event, and scrutinized Mr. Ellison for promoting Plaintiff MITCHELL as his successor. Ms. Sampson argued that it was a decision for the BOD as it was a crucial position that greatly affected the

---

[2] At the time of Plaintiff MITCHELL's termination, Defendant RIVERBAY's BOD consisted of Sonia Felicano (President), Claudia Sampson (Vice President), Angel Rosario (Second Vice President), Kevin Lambright (Treasurer), Bernard Cylich (Secretary), Rod Saunders, Anika Green-Watson, Leslie Peterson, Daryl Johnson, Mary Pearson, Linette Wright, Leah Richardson, Michelle Marbury, Andrea Leslie, Monique Coleman.

community, despite the inclusion of the responsibility in Defendant RIVERBAY's contract for the Executive General Manager position.

31. The following day, Sonia Feliciano (Hispanic), President of the BOD, called Plaintiff MITCHELL to notify him that while she would advocate for his promotion, she would also advise him to tell Mr. Ellison to stop promoting Plaintiff, in order to avoid the BOD's agitation.

32. Plaintiff MITCHELL shared with Ms. Feliciano his discomfort with the advice to correct Mr. Ellison's conduct, as Mr. Ellison was his superior. Plaintiff suggested Ms. Felciano speak to Mr. Klehammer, as Mr. Klehammer held supervisory authority over Mr. Ellison.

33. Plaintiff MITCHELL reported Ms. Feliciano's statement to both Mr. Ellison and Mr. Klehammer.

34. Despite Mr. Ellison's, Mr. Klehammer's, Mr. Smith's, and Ms. Feliciano's initial expressed support for Plaintiff MITCHELL's succession to General Manager of Defendant RIVERBAY, Plaintiff felt a shift in the BOD's attitude toward his promotion, sensing a growing reluctance to endorse him.

35. Yet, Ms. Felicano and Angel Rosario (Hispanic), Second Vice President of the BOD, frequently held meetings with Plaintiff MITCHELL to discuss the position and updates regarding the BOD's appointment of a new General Manager. In fact, during one of these meetings, Ms. Feliciano informed Plaintiff that in her conversations and meetings with the BOD, she was gradually supporting Plaintiff's promotion while fostering an environment of collaboration in decision-making amongst the BOD, despite the BOD's expressed desire to promote a Black executive.

36. Though Ms. Feliciano and Mr. Rosario frequently expressed their support of Plaintiff MITCHELL's promotion to General Manager and assured him that they were making efforts

to gain the BOD's support, they also paradoxically began directing Plaintiff to remain patient and refrain from discussing his vision and goals as General Manager, in contradiction to their initial advice of sharing such visions with the BOD and other employees of Defendants.

37. Confused by the direction he was receiving, Plaintiff MITCHELL ultimately decided to refrain from speaking about the future and remain patient until he was provided with an update.

38. Lacking transparency and clarification, in or around December 2022, Mr. Klehammer asked Mr. Ellison if he would delay his retirement by one month to allow Defendants time to enact their transition. As a result, conversations within Defendant RIVERBAY's BOD shifted, suggesting that Plaintiff MITCHELL be considered for Interim General Manager.

39. Upon information and belief, the divisiveness between the BOD and Mr. Klehammer grew significantly, resulting in a stalemate in the appointment of a new General Manager. Stuck in the middle, Plaintiff MITCHELL requested a meeting with Ms. Feliciano and Mr. Klehammer to discuss an amicable solution to the months-long contention.

40. In or around January 2023, as Mr. Ellison's retirement approached, clarifications regarding the appointment of Mr. Ellison's successor had not yet been made, causing confusion amongst Plaintiff MITCHELL and other executives.

41. For example, citing his contract between Defendant RIVERBAY and Defendant ELLIMAN, Mr. Klehammer maintained that he had full authority over the appointment of a candidate for General Manager of Defendant RIVERBAY.

42. Consequently, on or around February 6, 2023, following Mr. Ellison's retirement, Mr. Klehammer exercised his contractual authority to promote Plaintiff MITCHELL to General Manager.

43. The same evening of February 6, Ms. Feliciano called an emergency BOD meeting under the

guise of a "legal committee meeting," where a resolution was passed to freeze the position and give signatory rights for Mr. Ellison's position to Mr. Smith (Black).

44. Notably, the executive team at this time consisted of Mr. Ellison, General Manager, Mr. Klehammer, Executive General Manager, Mr. Smith, Assistant Executive General Manager, and Plaintiff MITCHELL, Deputy General Manager.

45. Following the BOD's resolution, employees of Defendants expressed to Plaintiff their belief that the underlying motivation for the sudden resolution was the Board's preference against appointing a White General Manager.

46. Further, Mr. Rosario informed Plaintiff MITCHELL that in an executive BOD meeting, Daryl Johnson (Black), a Defendant RIVERBAY's BOD Member, stated that Plaintiff was "collateral damage," and the board was not going to have a "White man dictate the future face of our community." This comment referred to Mr. Klehammer, who is White, and reflected the BOD's desire to prevent him from selecting another White male to serve as the public face of the community.

47. Notably, approximately one week before the resolution, Plaintiff MITCHELL had met with Ms. Feliciano and Mr. Rosario to discuss the negative effects on Plaintiff's mental health resulting from feelings of being unappreciated for his nearly thirty years of dedication to the Defendants, and demoralization because of Defendant RIVERBAY's ongoing deferral of the appointment of a new General Manager, a position that Plaintiff had been qualified for and earned. Ms. Felicano and Mr. Rosario again advised him to remain patient and assured him of a plan to make him Interim General Manager.

48. As a result of this meeting, Ms. Feliciano had conceived a two-part plan to promote Plaintiff MITCHELL. The first part constituted Ms. Feliciano proposing Plaintiff MITCHELL as the

acting Interim General Manager. Second, following Mr. Klehammer's planned retirement in April 2023, the new Executive General Manager would elect a General Manager allowing Plaintiff to "prove himself" as the indisputable option for the role of General Manager.

49. However, on or around February 11, 2023, the BOD published the emergency resolutions in the Co-Op City Times, effectively blocking Plaintiff MITCHELL's promotion by stating that the budget line had been frozen for the General Manager position, and Mr. Smith would assume power and all authority of the General Manager role.

50. Approximately one week following the publication, Plaintiff MITCHELL confronted Ms. Feliciano and Mr. Rosario about the resolutions.

51. In his meeting with Ms. Feliciano, she notified Plaintiff MITCHELL that the BOD opposed the recommendation of an Interim General Manager, electing to wait until the April 2023 election of the new Executive General Manager to decide on a General Manager. Plaintiff again expressed his extreme demoralization resulting from Defendants' failure to recognize his commitment to the company and community, and for the patience he had exhibited despite the contradictory and troubling messaging he had been receiving from Ms. Feliciano and other employees of Defendants.

52. Plaintiff MITCHELL also raised concerns with Ms. Feliciano regarding Defendants' discriminatory animus toward him as a White employee. In response, Ms. Feliciano affirmed, in sum and substance, that Plaintiff's promotion would not be an issue if he looked like Mr. Smith, who is Black.

53. In speaking with Mr. Rosario, Plaintiff MITCHELL came to learn that it was Mr. Rosario's impression that Ms. Feliciano's deception did not rely solely on her convictions, but also on extreme pressure imposed by some of Defendant RIVERBAY's BOD members, namely Kevin

Lambright (Black), Mr. Johnson (Black), Ms. Sampson (Hispanic), Leslie Peterson (Black), and Rod Saunders (Black), to avoid promoting a "White person."

54. Ms. Feliciano again expressed her support to Plaintiff MITCHELL, and assured Plaintiff that she was actively challenging the BOD's goal to specifically appoint a Black individual for the role by asserting that employees in any position should be selected based on their qualifications, not their race.

55. Ms. Feliciano further emphasized Defendants' discriminatory animus by stating, "but, you know, being honest, **it's been racial here for a long time. And some people that deserve certain promotions don't even get looked at. You know, they get overlooked in the company."** This disclosure only heightened Plaintiff's feeling of demoralization.

56. Notably, Ms. Feliciano's observation of Defendants' refusal to promote Plaintiff MITCHELL due to his race (White) was also observed by others.

57. Specifically, Mr. Smith, whom Plaintiff MITCHELL believed to be experiencing pressure from the BOD to elect a Black employee to General Manager, shared with Plaintiff, "**When you hear it's a racial thing. It's like damn, man…I know how that feels and I hate it.** It's crazy here that it's the opposite…I've never been with the shoe on the other foot now, so this is I don't like that at all…"

58. Nonetheless, Plaintiff MITCHELL remained devoted to Defendants and continued in his role as Deputy General Manager, overseeing 17 departments, as the BOD sought a new Executive General Manager to replace Mr. Klehammer.

59. In or around April 2023, Marvin Walton (Black) was hired as the new Executive General Manager. Immediately upon the commencement of his employment, Mr. Walton was tasked by Defendant RIVERBAY's BOD with deciding whether to promote Plaintiff MITCHELL to

the General Manager position within 90 days.

60. During initial meetings with Plaintiff MITCHELL, Mr. Walton expressed skepticism about Plaintiff, questioning Plaintiff's motives and suggesting an uphill battle for Plaintiff's promotion.

61. Mr. Walton's interactions with Plaintiff MITCHELL were often strained, with comments indicating a lack of faith in Plaintiff's trustworthiness and implying personal animosity.

62. For example, during his first meeting with Plaintiff MITCHELL, Mr. Walton asked Plaintiff if he had read Mr. Walton's resume and if Plaintiff had made remarks that Mr. Walton did not offer anything more to the company. Plaintiff denied both accusations, asserting that they were false.

63. Notably, the only occasion on which Plaintiff MITCHELL had spoken about Mr. Walton was when he was approached by Ms. Feliciano in or around January 2023, asking for Plaintiff's opinion on two candidates she was considering for the position of Executive General Manager, one of whom was Mr. Walton. Plaintiff never saw Mr. Walton's resume; however, Ms. Feliciano informed Plaintiff that, like Plaintiff and Mr. Smith, Mr. Walton had a strong operations background, which Plaintiff speculated could be helpful to the growth of Defendants, if Mr. Walton brought an additional skillset, but could be a missed opportunity if he did not.

64. Furthermore, Mr. Walton interrogated Plaintiff MITCHELL as to why Plaintiff had not informed Mr. Walton of his time off during Mr. Walton's start week. Plaintiff explained that the time off was for a pre-planned vacation previously approved by Mr. Klehammer.

65. Surprisingly, Mr. Walton responded by asserting that Plaintiff should have notified him of the time off via LinkedIn when Plaintiff connected with Mr. Walton on or around March 29, 2023,

where they exchanged brief messages to start their professional relationship.

66. Over the following six months, Plaintiff MITCHELL continued to perform his job diligently to prove himself worthy of the General Manager promotion.

67. However, despite Plaintiff MITCHELL remaining cordial, Mr. Walton often made comments leading Plaintiff to question Mr. Walton's impressions of Plaintiff including, "My decision to promote you is not personal, I don't know you any better than a can of paint" and "You smile too much, I'm not sure if you're mocking me."

68. As the 90-day selection period passed without a decision, Plaintiff MITCHELL's belief that Defendants' and Mr. Walton's failure to promote him to General Manager was racially motivated, solidified.

69. On or around September 19, 2023, Plaintiff MITCHELL complained to Mr. Rosario about the racial discrimination he had been experiencing from Defendants, Mr. Walton, and their preference for Black management.

70. Mr. Rosario quickly responded, stating that he would "**paint [Plaintiff MITCHELL] Black**" further evidencing the racially motivated culture at Defendants, and Defendants overlooking Plaintiff's hard work and qualifications because of his race.

71. Despite Plaintiff MITCHELL's efforts, in or around October 2023, Mr. Walton informed Plaintiff that he would not be receiving the position of General Manager, as Mr. Walton had eliminated the role by reallocating the duties of Plaintiff's 17 subordinate departments between Mr. Smith and Plaintiff.

72. On or around November 11, 2023, Plaintiff MITCHELL and Ms. Feliciano again spoke about the General Manager position, and Ms. Feliciano's belief that Plaintiff was being discriminated against due to his race.

73. Specifically, during this conversation, Ms. Feliciano reiterated the BOD's desire for a Black General Manager, stating that the BOD wanted a "Black man" and her belief that the fact that Plaintiff is White "shouldn't make a difference."

74. Notably, of the 15 members of Defendants' executive management and BOD, approximately 10 members are Black.

75. Then, in or around December 2023, Mr. Walton introduced Plaintiff MITCHELL to his plan to change the assignments of all staff in Co-Op City, specifically, relocating staff to different buildings within the 35 high-rise and 7 townhouse cluster buildings development.

76. Plaintiff MITCHELL advised Mr. Walton against the proposed staff reshuffling, noting the desire for familiarity and potential negative reactions from residents and building association leadership.

77. Plaintiff MITCHELL and Mr. Walton engaged in a series of conversations regarding this proposition and trust within the community. However, it was ultimately decided by Mr. Walton that the shift would be completed by mid-January 2024.

78. Subsequently, Plaintiff MITCHELL informed his leadership teams responsible for the staff about the timeline of the implementation of change and relayed that Mr. Walton's vision was best for the community, citing an anecdote about the New York City Housing Authority (NYCHA) that Mr. Walton had shared with Plaintiff to support his reasoning for the restructuring about a housing manager that was misusing credits to help specific members of her property.

79. Mr. Walton emphasized that though she did not do anything wrong fiduciarily, breaking the worker's familiar relationships with the residents can prevent potential issues.

80. In or around January 2024, Mr. Walton's restructuring was implemented. As Plaintiff

MITCHELL had predicted, Mr. Walton's decision to proceed with the reshuffling caused disruption among residents, leading to increased calls, petitions, and protests. Shockingly, Mr. Walton began attributing the dissatisfaction to Plaintiff "undermining" him and began interrogating Plaintiff on how the staff knew about his anecdote.

81. Plaintiff MITCHELL attempted to explain that he had spoken highly of Mr. Walton and utilized the anecdote as an example to support the new practice, but Mr. Walton remained distrustful, pointing to staff knowledge of the anecdote as evidence that Plaintiff's motives were unclear.

82. To show Mr. Walton his intentions, Plaintiff MITCHELL answered Mr. Walton's outstanding questions in a clear, concise manner. However, when asked if Mr. Walton was satisfied with Plaintiff's reasoning, Mr. Walton simply responded, "I am not dissatisfied."

83. Then, in or around late March 2024, Mr. Walton tasked Plaintiff MITCHELL with working with an external contracting company to perform turn-key work[3] on apartments within Co-Op City after a prior fallout with the company due to inflated invoices and poor-quality standards.

84. Notably, upon information and belief, the contracting company is owned by the cousin of a member of Defendants' BOD. Defendants' relationship with the contracting company began positively; however, after three months of delays and damaged materials, Defendants decided to complete all turn-key work internally.

85. In or around April 2024, Plaintiff MITCHELL became privy to an incident with the contracting company in which the contractor, while on Defendants' property, struck a resident's vehicle. The incident became especially problematic when it was discovered that the contractor did not possess the necessary commercial vehicle insurance outlined by Defendants' and the

---

[3] "Turn-key work" refers to maintenance done to a unit after a tenant moves out to return the unit to proper move-in condition for resale.

contracting company's contract, despite having possessed it at the time of the contract's commencement.

86. On or around May 1, 2024, Plaintiff MITCHELL reported the accident and Defendants' exposure due to the contracting company's violation of the law to Mr. Walton, advising Mr. Walton to terminate Defendants' contract with the contracting company.

87. Mr. Walton appeared to agree with Plaintiff MITCHELL's advice, assuring him he would speak with Jeff Buss, Legal Counsel for Defendants. Mr. Walton then informed Plaintiff that his yearly evaluation would be conducted that Friday, two days later.

88. Following his conversation with Mr. Walton, Plaintiff MITCHELL spoke with Mr. Smith about his advice to Mr. Walton to terminate the relationship with the contracting company, as he had concerns regarding their trustworthiness as evidenced by their connection to the BOD member and the circumstances surrounding the accident.

89. However, on or around May 3, 2024, two days after his conversation with Mr. Walton regarding the contracting company, with Ms. Cooper and Mr. Buss, Defendant's counsel present, Plaintiff MITCHELL was terminated by Mr. Walton. When Plaintiff inquired about the reason for termination, Mr. Walton had stated that there was no reason or cause, and the decision was not personal.

90. Notably, nearly two weeks after Plaintiff MITCHELL's termination, Plaintiff was replaced by one of his subordinates, who, upon information and belief, is part Black and had been working for the Defendants for approximately four years. Additionally, Plaintiff MITCHELL's replacement did not hold the certifications and licenses obtained by Plaintiff, or have any training in process management, capital improvement management, or budgeting, all of which are important to the role of Deputy General Manager.

91. Throughout his employment, Plaintiff MITCHELL experienced numerous instances of discriminatory behavior and biased decision-making by board members.

92. Defendants refused to promote Plaintiff MITCHELL into a role that he was qualified for and had earned, despite his nearly thirty years of dedication to Defendants, due to Defendants' discriminatory animus against promoting a "White man".

93. Plaintiff MITCHELL's termination was motivated by discriminatory animus toward Plaintiff's race and retaliatory motive for Plaintiff's complaints of racial discrimination.

94. Plaintiff MITCHELL's termination occurred despite his longstanding positive performance, numerous promotions, and endorsements from former executives and the Human Resource Director, Ms. Cooper.

95. Plaintiff MITCHELL has been unlawfully discriminated and retaliated against, humiliated, and degraded.

96. Defendants' actions were intentional and aimed at causing harm to Plaintiff MITCHELL.

97. As a consequence of the Defendants' actions, Plaintiff MITCHELL feels victimized, embarrassed, and emotionally distressed.

98. Due to the acts and conduct described herein, Plaintiff MITCHELL has suffered and will continue to suffer from loss of income, salary, bonuses, benefits, and other compensation associated with his employment, as well as future financial losses, emotional pain and suffering, inconvenience, and a diminished quality of life.

99. Because the Defendants' conduct was malicious, willful, outrageous, and executed with full knowledge of its illegality, Plaintiff MITCHELL demands punitive damages.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**

100. Plaintiff MITCHELL repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

101. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, for relief based upon the unlawful employment practices of Defendants. Plaintiff MITCHELL complains that Defendants violated Title VII's prohibition against discrimination based, in whole or in part, upon an employee's race.

102. Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff MITCHELL because of his race:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual for his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

103. Defendants engaged in unlawful employment practices prohibited by Title VII, by discriminating against Plaintiff MITCHELL because of his race.

104. Accordingly, as a result of the unlawful conduct of the Defendants, Plaintiff MITCHELL has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**SECOND CAUSE OF ACTION**
**RETALIATION UNDER TITLE VII**

105. Plaintiff MITCHELL repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

106. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

107. Defendants violated the sections cited herein as set forth through, among other things, unlawfully subjected Plaintiff MITCHELL to more difficult work as a result of his good faith complaints of discrimination.

108. Accordingly, as a result of the unlawful conduct of the Defendants, Plaintiff MITCHELL has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**THIRD CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYSHRL**

109. Plaintiff MITCHELL repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

110. Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, **race**, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

111. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff MITCHELL because of his race.

112. Accordingly, as a result of the unlawful conduct of the Defendants, Plaintiff MITCHELL has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**FOURTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYSHRL**

113. Plaintiff MITCHELL repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

114. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

115. Defendants violated the section cited herein as set forth.

116. Accordingly, as a result of the Defendants' unlawful conduct, Plaintiff MITCHELL has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**FIFTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE NYCHRL**

117. Plaintiff MITCHELL repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if same were set forth herein fully at length.

118. The New York City Administrative Code § 8-107(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

119. Defendants engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code § 8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff MITCHELL because of his race (White).

120. Accordingly, as a result of the unlawful conduct of the Defendants, Plaintiff MITCHELL has been damaged as set forth herein and is entitled to the maximum compensation available to him under this statute.

**SIXTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYCHRL**

121. Plaintiff MITCHELL repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if same were set forth herein fully at length.

122. New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer…to discriminate against any person because such person has opposed any practices forbidden under this chapter…"

123. Defendants violated the section cited herein as set forth.

124. Plaintiff MITCHELL is entitled to the maximum amount allowed under this statute.

**JURY DEMAND**

125. Plaintiff MITCHELL requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff MITCHELL respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in, and enjoining Defendants from continuing to

engage in, unlawful employment practices prohibited by the New York State Human Rights Law, and the New York State Executive Law § 296, *et seq.* in that Defendants subjected Plaintiff MITCHELL to discrimination on the basis of his race and retaliation for complaining of race discrimination;

B. Awarding damages to Plaintiff MITCHELL for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff MITCHELL compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff MITCHELL punitive damages;

E. Awarding Plaintiff MITCHELL attorneys' fees, costs, and expenses incurred in the prosecution of the action, and;

F. Awarding Plaintiff MITCHELL such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
July 28, 2025

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

By: /s/ Dorina Cela

Dorina Cela, Esq.
Kayla Wheeler, Esq.
*Attorneys for Plaintiff*
45 Broadway, Floor 28
New York, New York 10006
(212) 248-7431
dcela@tpglaws.com
kwheeler@tpglaws.com

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/29/2025

**To:** Mr. Warren Mitchell
64 Whitewood Ave
New Rochelle, NY 10805

Charge No: 520-2025-04031

EEOC Representative and email: ARACELY FRANCOIS
Federal Investigator
aracely.francois@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Elizabeth Rader
04/29/2025

Elizabeth Rader
Acting District Director

**Cc:**
Jeffrey D Buss
Riverbay Corporation
2049 Bartow Avenue
Bronx, NY 10475

Maxine Nicholas Esq.
mnicholas@grsm.com

Incident Location
Riverbay Corporation
2049 Bartow Ave
Bronx, NY 10475

NA NA
2049 BARTOW AVE
BRONX, NY 10475

Dorina Cela Esq.
45 Broadway Floor 28
New York, NY 10006

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2025-04031 to the

District Director at Elizabeth Rader, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2025-04031 to the District Director at Elizabeth Rader, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/29/2025

**To:** Mr. Warren Mitchell
64 Whitewood Ave
New Rochelle, NY 10805
Charge No: 520-2025-04032

EEOC Representative and email: ARACELY FRANCOIS
Federal Investigator
aracely.francois@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Elizabeth Rader
04/29/2025

Elizabeth Rader
Acting District Director

**Cc:**
NA NA
675 3RD AVE FL 5
NEW YORK, NY 10017

Maxine Nicholas Esq.
mnicholas@grsm.com

Incident Location
Douglas Elliman Property Management
2049 Bartow Ave
Bronx, NY 10475

Dorina Cela Esq.
45 Broadway Floor 28
New York, NY 10006

Please retain this notice for your records.

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2025-04032 to the

District Director at Elizabeth Rader, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2025-04032 to the District Director at Elizabeth Rader, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.